71 F.3d 732
 95 Cal. Daily Op. Serv. 9034, 95 Daily Journal
D.A.R. 15,866
Martin STIVERS; Mary Chase Ernsberger; Chamar, Inc.,
Plaintiffs-Appellants,
v.
Richard PIERCE; George D. Wendell; Denise Conrad; Gary T.
Robey; Brian McKay; Carol Widmer-Hanna; Robert J.
Rodefer; Bill Bertram; individually and as members of the
Nevada State Private Investigators Licensing Board; The
Nevada State Private Investigators Licensing Board; and
Does 1-10, Defendants-Appellees.
 Nos. 93-16756, 94-15966.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 16, 1995.
Decided Dec. 1, 1995.
 
 Terri Keyser-Cooper, Reno, Nevada, for the plaintiffs-appellants.
 P. Mark Ghan, Assistant Attorney General, Carson City, Nevada, for the defendants-appellees.
 Appeals from the United States District Court for the District of Nevada.
 Before: FLETCHER, REINHARDT, and JOHN T. NOONAN, Jr., Circuit Judges.
 Opinion by Judge REINHARDT; Concurrence by Judge NOONAN.
 OPINION
 REINHARDT, Circuit Judge:
 
 
 1
 This action arises out of decisions by the Nevada State Private Investigators Licensing Board ("the Board"), denying the plaintiffs' applications for licenses in the fields of private investigation, private patrol, and process serving. The plaintiffs contend that one of the Board members had a pecuniary interest in the outcome and was biased against them. They also contend that, influenced by that member's bias, the other Board members and certain employees prejudged their applications and acted in an arbitrary and improper manner.
 
 
 2
 Plaintiffs Martin Stivers, Mary Chase Ernsberger, and Chamar, Inc. brought suit under section 1983 for declaratory relief, injunctive relief, and damages. The plaintiffs contend that the denial of their license applications violated their due process right to a fair hearing before an impartial tribunal. After this action was filed, the Board granted Stivers' application for individual licenses in order to settle the plaintiffs' claims for injunctive relief. The district court subsequently granted summary judgment to the defendants on the remaining claims, and rejected the plaintiffs' motion for attorney's fees for time spent pursuing injunctive relief. We affirm the grant of summary judgment as to Stivers' claim for damages against the Board, but reverse the grant of summary judgment as to his claim for damages against the individual defendants. We also reverse the denial of attorney's fees.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 3
 In March 1988, the plaintiffs filed license applications with the Board. Plaintiff Martin Stivers applied for licenses as a private investigator, private patrolman, and process server. Stivers, along with co-plaintiff Mary Chase Ernsberger, also submitted an application for a corporate license on behalf of "Chamar Inc.," a newly formed company. Between June 1988 and December 1989, the Board conducted five separate hearings to consider the plaintiffs' license applications. At the September 1988 meeting, it denied Chamar's application for corporate licenses because of alleged "unlicensed activity." It later denied Stivers' application for "lack of integrity." The plaintiffs allege that, in denying their applications, members and employees of the Board violated their due process rights. In particular, they contend that defendant Richard Pierce, a member of the Board, had a pecuniary and personal interest in ensuring that their applications were denied, that Pierce was actually biased against the plaintiffs, and that the Board's actions were influenced by Pierce's bias.
 
 A. Pierce's Background
 
 4
 To understand the plaintiffs' allegations regarding Pierce's bias, it is helpful to step back several years.[1] In the mid-1970's, Pierce was employed as a private investigator, polygraph examiner, and process server for Russ Jones and Associates, a private security and investigation firm that was at that time owned by Russ Jones. When Jones refused to permit Pierce to become a co-owner, Pierce became angry and resentful. While Jones was away on vacation, and had temporarily left Pierce in charge of Jones' company, Pierce started his own business in direct competition with Russ Jones and Associates. Not surprisingly, the two men exchanged angry words upon Jones' return. During their heated exchange, Pierce threatened to run Jones' company out of business.
 
 
 5
 After leaving Russ Jones and Associates, Pierce's own business prospered. Dick Pierce and Associates soon becoming the largest private security company in Northern Nevada. In 1986, Pierce became one of the five members of the Nevada Private Investigators Licensing Board. A creature of Nevada Statute, the Board consists of the Attorney General (or his designate) and four members appointed by the Governor. Nev.Rev.Stat. Sec. 648.020(1). Of the Governor's appointees, one must be a private investigator, one a private patrolman, one a polygraph examiner, and one a representative of the general public. Nev.Rev.Stat. Sec. 648.020(2). The Board is responsible for licensing and regulating private investigators, private patrolmen, process servers, polygraph operators, repossessors, dog handlers, and companies providing these services. Nev.Rev.Stat. Secs. 648.030, 648.060, 648.070. No person or company may engage in any such business unless licensed by the Board. Nev.Rev.Stat. Sec. 648.060. As a member of the Board, Pierce had authority to vote on the licensing of companies which would compete directly with Dick Pierce and Associates.
 
 B. Stivers' Background
 
 6
 Stivers has a long history in the private investigation and security business. He has worked as a private patrolman, private investigator, and process server for a total of 30 years. He was licensed in North Dakota in 1980 and, when he left that state in 1986, his license was still in good standing. Stivers arrived in Nevada in 1986, intending to start his own business. That same year, he became the general manager of the Reno branch office of Great Western Security, a Carson City based company.
 
 
 7
 As manager of Great Western's Reno branch, Stivers aggressively sought new business. Among the more lucrative opportunities pursued by Stivers was security for the convention business for Bally's Casino in Reno. Bally's had previously employed Dick Pierce and Associates for the vast majority of its convention security needs. Under Stivers' direction, however, Great Western was "very successful" in outbidding Pierce's company and "took away a substantial amount of business from Mr. Pierce," including business at Bally's. Great Western's successful bidding cost Pierce approximately $55,000 overall.
 
 C. Formation of Chamar
 
 8
 Upon arriving in Reno, Stivers became friends with Ernsberger, and the two made plans to enter the private security business together: Ernsberger would put up the cash to purchase a company; Stivers, with his long history in the industry, was to run the business.
 
 
 9
 While employed with Great Western, Stivers became acquainted with W.G. "Butch" Tamblyn, who was then owner of Russ Jones and Associates. Tamblyn had purchased the company from Russ Jones in the early 1980's and, by 1987, was hoping to sell it. Stivers and Ernsberger reached an agreement with Tamblyn. Stivers and Ernsberger formed Chamar, Inc. for the purpose of purchasing the assets of Russ Jones and Associates. Under the agreement, Tamblyn would not sell the corporation itself, at least immediately. Until licenses could be obtained for Chamar, they would all do business under the name of Russ Jones and Associates.
 
 
 10
 Under Nevada law, corporations providing private investigation and security services are required to have a licensed "qualifying agent"--a person meeting the individual licensing requirements for the type of work in which the company engages. Nev.Rev.Stat. Sec. 648.110. Tamblyn agreed to remain the "qualifying agent" of Russ Jones and Associates until August 1992. Stivers expected that he would be able to obtain a license to act as Chamar's qualifying agent after that date.
 
 
 11
 Pursuant to the agreement, Chamar purchased the assets of Russ Jones and Associates in August 1987. Shortly after the sale, Tamblyn notified Carol Widmer-Hanna, the Board's executive secretary, of the change in ownership. Tamblyn explained that the corporation's assets had been sold to Chamar, but that the business would temporarily continue to operate under the name Russ Jones and Associates, with Tamblyn remaining the corporation's qualifying agent. Widmer-Hanna told him that they were "proceeding fine." At Widmer-Hanna's request, Tamblyn sent written notification of the change in corporate structure. Neither Widmer-Hanna nor any other representative of the Board informed Tamblyn that there was anything improper about the arrangement to which he, Stivers, and Ernsberger had agreed.
 
 D. The Application Process
 
 12
 In December 1987, Ernsberger and Stivers began the process of filing applications for the appropriate licenses, in accordance with Nev.Rev.Stat. Sec. 648.070. Ernsberger and Stivers delivered to Widmer-Hanna a copy of Chamar's certificate of corporate good standing, along with the purchase agreement between Chamar and Russ Jones and Associates. In March 1988, applications were submitted for the license of Chamar, and for licenses for Stivers and Ernsberger as corporate officers of Chamar, along with their application fee of $750. Stivers filed an application for qualifying agent status as a private investigator, private patrolman, and process server for Chamar, with additional fees of $1,550.
 
 
 13
 Problems began to develop in June 1988, when the plaintiffs appeared before the Board for the first time. Despite her prior communications with Tamblyn, the Board's executive secretary, Widmer-Hanna, had erroneously placed plaintiffs on the agenda as a "name change." Pierce led the questioning, insisting that it was inappropriate to consider Chamar's application as a name change, since Stivers and Ernsberger were in fact seeking licenses for a new corporation. Consideration of the plaintiffs' applications was for this reason deferred until September 1988. Concerned that their business might not be operating legally, Stivers specifically asked the Board whether Russ Jones and Associates could continue to do business until the September 1988 meeting. Board members Robey, Widmer-Hanna, and Giordano (the Deputy Attorney General) each replied that the plaintiffs could continue to do business "under Russ Jones," as long as Tamblyn remained the qualifying agent. Following the Board's instructions, the plaintiffs' business continued to operate under the name Russ Jones and Associates with Tamblyn as qualifying agent.
 
 
 14
 Despite the Board's assurances at the June 1988 hearing, Pierce opened the next hearing in September 1988 by accusing the plaintiffs of "doing business without a license." Stivers responded by informing the Board that he was not aware of any violation of state law. Although Stivers and his attorney told the Board that their business was operating under the name Russ Jones and Associates, that Tamblyn was the qualifying agent, and that Chamar had never engaged in the patrol or security business, Pierce repeatedly accused the plaintiffs of operating illegally. In addition, the Board members questioned Stivers extensively about his past experience, accused him of lying about his credentials, and refused to accept his affidavits regarding his experience. The Board unanimously voted to deny a corporate license on the basis of "unlicensed activity." See Nev.Rev.Stat. Sec. 648.110(3)(f). Upon Pierce's suggestion that the remaining license applications were "moot," the Board declined to consider Stivers' applications for private investigator, private patrolman, or process server licenses.
 
 
 15
 On December 7, 1988, the plaintiffs brought suit in Nevada state court to contest the Board's denials of their license applications. In January 1989, plaintiffs and their lawyers met with Board counsel Dana Sammons, who agreed that the plaintiffs had been operating legally. Sammons told the plaintiffs that they would be granted the licenses they sought if they appeared at the Board's next meeting. Relying on Sammons' representations, plaintiffs voluntarily dismissed their state action.
 
 
 16
 At its March 1989 meeting, Sammons informed the Board that plaintiffs had been operating legally and recommended that the licenses be granted. After a recess, Board members expressed "serious reservation[s]" about Stivers' qualifications and doubts about his "integrity." In particular, they expressed concern that Stivers lacked the requisite hours of experience required to obtain the licenses he sought. Board members based their concerns, at least in part, on an investigative report prepared by Robert Rodefer that raised questions about Stivers' background and experience.[2] Despite the recommendation of the Board's counsel, the Board refused to grant Stivers' application and postponed voting on all the applications until the next meeting.
 
 
 17
 Stivers again appeared before the Board in September 1989 with additional documentation of his experience. Although Board investigator Bill Bertram conceded that Stivers had 12,000 hours of private investigation experience--more than the required 10,000 hours--the Board remained unsatisfied on this point. Several members continued to accuse him of lying about his experience. Calling Stivers a "professional victim," Board member Denise Conrad moved to deny his application and Pierce seconded the motion. The Board voted unanimously to deny Stivers' application as a qualifying agent based on "untruthfulness or lack of integrity." See Nev.Rev.Stat. Sec. 648.100(3)(c). Pierce then moved that Chamar's application be denied, for the same reasons. When another board member suggested that Russ Jones and Associates' operations be permitted to continue, with Tamblyn acting as qualifying agent, Pierce vigorously disagreed. The Board deferred consideration of whether Tamblyn could be approved as a qualifying agent for Chamar until the next meeting.
 
 
 18
 At the December 1989 meeting, the plaintiffs' attorney informed the Board that Tamblyn would remain the qualifying agent for Russ Jones and Associates, instead of Stivers. The Board unanimously approved Ernsberger's application for corporate officer status with respect to Russ Jones and Associates, with Tamblyn to continue acting as qualifying agent for the company.
 
 E. District Court Proceedings
 
 19
 Plaintiffs filed this action in federal district court on September 6, 1991, alleging that the defendants had violated their rights under the due process and equal protection clauses. Their complaint requested damages as well as declaratory and injunctive relief. On January 6, 1992, the plaintiffs filed a motion for a preliminary injunction and petition for a writ of mandamus in order to secure their licenses.
 
 
 20
 In an effort to settle the claim for injunctive relief, the defendants agreed to convene a "special board" to reconsider Stivers' license applications.[3] Based on an application identical to that which Stivers had earlier submitted, the special board unanimously voted to grant Stivers individual licenses. Stivers has since become owner of S and W Protective Service, a Board licensed private patrol, process serving, and private investigation company. Chamar never obtained its license; it remains the parent company of Russ Jones and Associates, which continues to do business with Ernsberger as its Board licensed corporate officer and Tamblyn as its Board licensed qualifying agent.
 
 
 21
 After the special board's decision, plaintiffs withdrew their motion for preliminary injunction and mandamus, informing the court that there were no remaining issues pertaining to injunctive relief. The case proceeded on the plaintiffs' claims for declaratory relief and damages.
 
 
 22
 The district court subsequently granted summary judgment to the defendants. The court concluded that Chamar's complaint for denial of its license was barred by the statute of limitations. The court further concluded that Ernsberger had failed to state a claim on her own behalf and could not recover damages for harm done to Chamar. Although the district court found that Stivers had a protected property interest in the licenses that had been denied him, it granted summary judgment to the defendants, on the ground that Stivers had "not offered competent evidence to show that the [Board's] actions were irrational, malicious, capricious, or arbitrary." The court further stated that its inquiry was limited to "whether Defendants acted capriciously." The court did not address Stivers' allegations that Pierce harbored a personal bias against him and had a pecuniary interest in seeing his application denied. The plaintiffs appealed.
 
 
 23
 After Stivers obtained his licenses, but before the district court granted summary judgment, the plaintiffs filed a motion for attorney's fees. The court initially rejected the motion on the ground that it was premature. After summary judgment, the plaintiffs filed another motion for attorney's fees, asserting that they were entitled to fees for time spent pursuing injunctive relief, since Stivers had obtained the licenses he sought. The district court again denied their motion, reasoning that plaintiffs could not be considered prevailing parties--even though they had obtained injunctive relief--because they lost their damages claim on the merits. The plaintiffs appealed this order separately.
 
 II. DUE PROCESS CLAIM
 
 24
 The district court correctly found that the plaintiffs had a protected property interest in the licenses that were denied them, and the defendants do not seriously contest this finding.[4] The central question on appeal is whether a genuine issue of material fact exists as to Stivers' claim that he was denied his due process right to a fair hearing before an impartial tribunal.[5] We conclude that there is.A. Right to an Unbiased Tribunal
 
 
 25
 It is well-settled that the Due Process Clause prevents the state from depriving a plaintiff of a protected property interest without "a fair trial in a fair tribunal." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). As Justice Black wrote in Murchison:
 
 
 26
 A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.
 
 
 27
 Id. at 136, 75 S.Ct. at 625; see also Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980) ("the Due Process Clause entitles a person to an impartial and disinterested tribunal"). This requirement applies not only to courts, but also to state administrative agencies charged with applying eligibility criteria for licenses. Withrow v. Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); Gibson v. Berryhill, 411 U.S. 564, 578-79, 93 S.Ct. 1689, 1697-98, 36 L.Ed.2d 488 (1973). In attempting to make out a claim of unconstitutional bias, a plaintiff must "overcome a presumption of honesty and integrity" on the part of decision-makers. Withrow, 421 U.S. at 47, 95 S.Ct. at 1464. He must show that the adjudicator "has prejudged, or reasonably appears to have prejudged, an issue." Kenneally v. Lungren, 967 F.2d 329, 333 (9th Cir.1992) (quoting Partington v. Gedan, 880 F.2d 116, 135 (9th Cir.1989) (Reinhardt, J. concurring and dissenting)), cert. denied, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993).
 
 
 28
 There are two ways in which a plaintiff may establish that he has been denied his constitutional right to a fair hearing before an impartial tribunal. In some cases, the proceedings and surrounding circumstances may demonstrate actual bias on the part of the adjudicator. See Taylor v. Hayes, 418 U.S. 488, 501-04, 94 S.Ct. 2697, 2704-06, 41 L.Ed.2d 897 (1974); Cinderella Career and Finishing Schools, Inc. v. Federal Trade Comm'n, 425 F.2d 583, 591 (D.C.Cir.1970). In other cases, the adjudicator's pecuniary or personal interest in the outcome of the proceedings may create an appearance of partiality that violates due process, even without any showing of actual bias. Gibson, 411 U.S. at 578, 93 S.Ct. at 1697-98; see also Exxon Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir.1994) ("the Constitution is concerned not only with actual bias but also with 'the appearance of justice.' ").
 
 B. Evidence of Bias on the Part of Pierce
 
 29
 As this case demonstrates, the two categories of bias claims are not hermetically sealed. Stivers contends not only that Pierce had a pecuniary interest in denying his license applications, but also that Pierce was actually biased against him and that he acted on this bias during the licensing proceedings. Thus, he raises both an appearance of partiality claim and an actual bias claim.
 
 
 30
 On the present record, Pierce's personal and pecuniary interest in the outcome of the proceedings, standing alone, would probably be insufficient to support a claim that the appearance of partiality violated due process. See Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 825-26, 106 S.Ct. 1580, 1587-88, 89 L.Ed.2d 823 (1986) (adjudicator's "slight pecuniary interest" in outcome of proceedings does not in itself violate due process). Nor would the Board's repeated unfavorable rulings, standing alone, be sufficient to support a claim that Pierce or any other member of the Board was actually biased against him. See McCalden v. California Library Ass'n, 955 F.2d 1214, 1224 (9th Cir.1990) ("Adverse rulings alone are not sufficient to require recusal, even if the number of such rulings is extraordinarily high."), cert. denied, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992). However, when the evidence of Pierce's pecuniary interest is considered along with the evidence of discriminatory treatment by the Board, there is a genuine issue of fact as to whether the licensing proceedings were tainted by actual bias. Stivers has introduced sufficient evidence of bias on the part of Board member Richard Pierce to overcome the presumption of integrity.
 
 
 31
 The evidence that Stivers has introduced can be divided into the following categories: (1) evidence of Pierce's pecuniary interest in the outcome of the licensing proceedings; (2) evidence concerning Pierce's past association with Russ Jones and Associates; (3) evidence that Pierce made "extrajudicial" statements reflecting his personal hostility toward Stivers; (4) evidence that Stivers received unusually harsh and highly irregular treatment from the Board during the licensing hearings; and (5) evidence that the Board, through its employees, sought to impede and delay the plaintiffs' efforts to do business. The first category relates primarily to the appearance of bias, while the other categories pertain exclusively to Stivers' allegations that Pierce was actually biased against him. We examine each category separately, although we evaluate them collectively for purposes of determining whether a genuine issue of fact exists as to actual bias. As to the appearance of partiality, only the first category is relevant.
 
 1. Pierce's Pecuniary Interest
 
 32
 Stivers has introduced evidence showing that Pierce had a pecuniary interest in ensuring that Stivers' license applications were denied. A short time before the licensing proceedings began, Stivers had entered into direct competition with Dick Pierce and Associates. Stivers asserts that Pierce's pecuniary interest in stifling competition rendered his participation in the licensing proceedings constitutionally objectionable.
 
 
 33
 Among the cases in which the appearance of bias is "too high to be constitutionally tolerable" are those in which the adjudicator has a direct and substantial pecuniary interest in the outcome of the case before him. Withrow, 421 U.S. at 47, 95 S.Ct. at 1464. In such cases, the adjudicator's participation constitutes a per se violation of due process--the appearance of partiality in itself renders the proceedings objectionable, without any showing that the adjudicator was actually biased. Aetna Life, 475 U.S. at 825, 106 S.Ct. at 1587; Utica Packing Co. v. Block, 781 F.2d 71, 77-78 (6th Cir.1986).
 
 
 34
 The Supreme Court has held that a state licensing tribunal violates due process when its members have a direct and substantial competitive interest in the outcome of the proceedings before them. Gibson, 411 U.S. at 578-79, 93 S.Ct. at 1697-98. In Gibson, the Court considered the disciplinary proceedings of an optometry licensing board. The plaintiffs subject to license revocation proceedings were optometrists employed by an optometry company. All the members of the licensing board, however, were self-employed optometrists. 411 U.S. at 571, 93 S.Ct. at 1694. The district court found that, if the optometry company were forced to shut down, "the individual members of the Board, along with other private practitioners of optometry, would fall heir to this business." Id. Without requiring any showing that the board's decision was actually influenced by impermissible bias, the Court upheld the district court's conclusion that the board members' "substantial pecuniary interest" in denying licenses to competitors constituted a per se violation of the plaintiffs' right to due process. Id. at 579, 93 S.Ct. at 1698.
 
 
 35
 The Court's decision in Gibson did not invalidate all licensing boards that include industry representatives. After Gibson, the Court upheld a state statute requiring that a majority of optometry board members be drawn from an organization of professional optometrists. Friedman v. Rogers, 440 U.S. 1, 18, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979). More recently, the Court has made clear that due process is not violated by the participation of adjudicators who "might conceivably have had a slight pecuniary interest" in the outcome of the case before them. Aetna Life, 475 U.S. at 825, 106 S.Ct. at 1587 (1986). An adjudicator is, however, precluded from participating in decisions in which he has a "direct, personal, substantial, pecuniary interest." 475 U.S. at 822, 106 S.Ct. at 1585.
 
 
 36
 The fact that Pierce and Stivers have in the past competed for a few specific contracts is not in itself sufficient to meet this standard. While under Stivers' management, Great Western outbid Pierce's company for the convention business at Bally's and other business totalling $55,000, the contracts constituted a relatively small portion of Dick Pierce and Associates' $5 million annual receipts. Nevertheless, there may be a genuine issue as to whether Pierce had a sufficient interest in the denial of Stivers' application to necessitate his recusal. Unlike most other license applicants before the Board, who sought to do business in the more populous Southern Nevada region, Stivers intended to enter into business in the Reno area, where he would operate in direct competition with Pierce. See Wilkerson v. Johnson, 699 F.2d 325, 328 (6th Cir.1983) (licensing board member's interest in preventing barber shop from opening next door to his own created "unconstitutional risk of bias"). There are other pertinent facts that do not appear in the record as developed thus far. We do not know, for example, how many similar businesses are currently licensed in the Reno area, what effect one more business is likely to have, or even much about the nature of the market or the particular qualifications or attributes that Stivers and Pierce may possess. Such facts may be critical in determining whether Pierce had a "direct" and "substantial" pecuniary interest that would constitute a per se due process violation.
 
 
 37
 There are undoubtedly cases in which the appearance of partiality arising from competitive interests is sufficiently strong to warrant recusal. See Gibson, 411 U.S. at 578-79, 93 S.Ct. at 1697-98. A lawyer in a one-lawyer town, for example, would probably have a "direct" and "substantial" pecuniary interest in the licensing of a competitor planning to hang a shingle across the street. On the other hand, it is unlikely that any attorney practicing in a city like Los Angeles would have a competitive interest sufficiently strong to require that he be disqualified from considering the licensing of an additional lawyer.
 
 
 38
 We note that any per se rule governing the appearance of partiality must take into account the fact that the system of industry representation on governing or licensing bodies is an accepted practice throughout the nation. As the Supreme Court has pointed out, the Due Process Clause imposes "only broad limits ... on the exercise by the State of its authority to regulate its economic life, and particularly the conduct of its professions." Friedman, 440 U.S. at 18 n. 19, 99 S.Ct. at 898 n. 19. If members of a licensing board were disqualified whenever they have "some" competitive interest in the outcome of proceedings before them, practitioners in the field would as a practical matter be excluded from becoming members of such boards.
 
 
 39
 There are, of course, advantages to the involvement of industry representatives in licensing decisions. Private investigators, for example, can bring a particular practical understanding and perspective to the proceedings. It is presumably for this reason that the Board, by statute, must include a private investigator, a private patrolman, and a polygraphic examiner. See Nev.Rev.Statute Sec. 648.020(1). Were we to hold Pierce's participation impermissible, based solely on the fact that there may on occasion be "some" competition for clients, we would call into question the composition not only of the Board involved in the case before us but many other boards throughout the circuit that include industry representatives among their membership. That we do not wish to do.
 
 
 40
 Without more facts, it does not appear that Pierce's economic interest is such as to warrant a per se disqualification. Upon remand, however, Stivers is free to introduce evidence tending to show that Pierce's pecuniary interest is in fact sufficient to warrant application of the per se rule. On this appeal, we consider the evidence concerning Pierce's competitive interest for a different purpose. We consider it in connection with Stivers' claim that Pierce was actually biased against him. It is that claim which we now examine.
 
 2. Pierce's Past Business Association
 
 41
 Stivers contends that Pierce's relationship with Russ Jones and Associates during the 1970's rendered his participation in the decision to deny Stivers' applications constitutionally objectionable. We take as true the plaintiffs' charge that, upon Pierce's tumultuous departure from Russ Jones and Associates, he threatened to run the company out of business. Stivers contends that this statement reveals that Pierce had a bias against Russ Jones and Associates and that he should have recused himself from participating in the licensing proceedings for this reason.
 
 
 42
 We agree that unconstitutional bias may be shown through evidence that the adjudicator "had it 'in' for the party for reasons unrelated to the officer's view of the law." McLaughlin v. Union Oil of Calif., 869 F.2d 1039, 1047 (7th Cir.1989). However, we do not believe that the particular inference that plaintiffs would have us draw is warranted. A number of years after Pierce's departure from Russ Jones and Associates, the company was sold to Tamblyn, who in turn sold the company's assets to Stivers and Ernsberger years later. While it might be reasonable to conclude that Pierce harbored a personal grudge against Jones, there is no rational basis for concluding that he retained a bias against the corporation that Jones had previously owned, particularly since Jones had sold it to a disinterested third party a number of years earlier. Pierce's past association with Russ Jones and Associates is wholly insufficient to overcome the "presumption of honesty and integrity in those serving as adjudicators." Withrow, 421 U.S. at 47, 95 S.Ct. at 1464. Because the dispute between Pierce and the former owner of Russ Jones and Associates is so far removed from the events at issue in this case, we conclude as a matter of law that they have no relevance to the question whether the denial of the plaintiffs' license applications violated due process.
 
 3. Pierce's Statements About Stivers
 
 43
 In addition to alleging that Pierce had a pecuniary interest in the outcome of the licensing proceedings, Stivers has also introduced evidence that Pierce harbored a personal bias against him. A party alleging unconstitutional bias may prove this claim by introducing extrajudicial statements by the adjudicator that are inconsistent with the role of impartial decisionmaker. Jenkins v. Sterlacci, 849 F.2d 627, 634 (D.C.Cir.1988).
 
 
 44
 An affidavit from Patty Bavol, the manager of an apartment complex in Reno, reports derogatory statements that Pierce made about Stivers during a business visit in the spring of 1989--while Stivers' application was pending before the Board. Stivers had recently been shot in the chest by an unknown attacker while investigating a burglary. Pierce, who was providing security services to Bavol's apartment, laughed about the shooting and remarked that "everybody knew Marty [Stivers] had shot himself." From this and other comments Pierce made that day, Bavol believed it clear that Pierce harbored "an extremely negative, biased, attitude toward Mr. Stivers."
 
 
 45
 Pierce's derogatory statement lends some support to the view that his opposition to the plaintiffs' application was the consequence of his hostility toward Stivers. See Taylor, 418 U.S. at 501, 94 S.Ct. at 2704-05 (adjudicator's remarks demonstrated personal animus toward litigant violative of due process); Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir.1994) (running controversy between the plaintiff and the board showed that board had prejudged issue). The statement tends to support the allegation that Pierce's opposition to Stivers was the product of personal animosity, rather than the merits of his application. See McLaughlin, 869 F.2d at 1047. Standing alone, Bavol's affidavit would clearly be insufficient to demonstrate that Pierce prejudged Stivers' application. However, we do not view the hostile statement in isolation; instead, we examine it in connection with all the other evidence tending to establish or rebut the charge of bias.4. The Licensing Hearings
 
 
 46
 We also consider the treatment accorded to the plaintiffs by the Board. As the Sixth Circuit noted in Wilkerson v. Johnson, the "regular and impartial administration of public rules governing these interests [in occupational licenses], as required by due process, prohibits the subtle distortions of prejudice and bias as well as gross governmental violations...." 699 F.2d at 328 (citing Gibson, 411 U.S. at 564, 93 S.Ct. at 1690-91). In Wilkerson, the plaintiffs offered evidence that one member of a barber's licensing board had a competitive interest in denying their application, that the board had delayed in acting upon their application, and that the board had harassed them during the application process. Id. at 328. In view of this evidence, the Sixth Circuit upheld the jury's conclusion that the board was motivated by impermissible bias. Id.
 
 
 47
 We agree with the Sixth Circuit that it is appropriate to look to irregularities in the treatment that a license applicant receives from the Board in determining whether the decision-making process was affected by impermissible bias on the part of one of its members. See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 882 F.2d 1398, 1409 (9th Cir.1989) ("malicious, irrational and plainly arbitrary actions are not within the legitimate purview of the state's power"), cert. denied, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). In addition to the evidence of Pierce's pecuniary interest and personal animus, the record contains substantial evidence showing that the treatment Stivers and Chamar received from the Board as a whole--and from Pierce in particular--was unusually harsh. Mel Tate, an investigator who frequently attended Board meetings, testified that the Board's consideration of Stivers' application was very unusual. According to Tate, the Board appeared to have "made up their minds" to reject Stivers' application and "seemed to be harboring a grudge toward him." See Bakalis, 35 F.3d at 326 (evidence tended to show that some members of board had prejudged case before it). In particular, Tate recalled the "very negative attitude of Dick Pierce," who "seemed to be biased against Stivers." Tate contrasted the treatment Stivers received with that received by other applicants. While the Board ordinarily accepted the statements of other applicants and requested only general descriptions of their background, it "kept pushing Stivers" and refused to accept any of his statements.
 
 
 48
 Stivers has also introduced evidence that the Board did not apply its licensing criteria in an evenhanded manner. See Wilkerson, 699 F.2d at 328. Minutes of other Board meetings corroborate Tate's observation that Stivers was treated markedly differently from other applicants. At meetings between 1985 and 1988, the Board granted licenses to at least 14 applicants without asking any questions. The Board has granted licenses to several people with criminal records, without raising any question as to their integrity. Although Stivers has no criminal record, the Board continually challenged his integrity during the several Board meetings at which he appeared. Furthermore, the Board granted licenses to many individuals and companies despite their "unlicensed activity," and to others who lacked the required experience and qualifications.
 
 
 49
 It is also noteworthy that the Board's members, including Pierce, disregarded the recommendations of its own legal counsel in denying Stivers' application. After the plaintiffs' filed suit in state court, the Board's counsel Sammons informed the Board that Russ Jones and Associates had been operating legally and recommended that the licenses be granted. The Board's decision to deny Stivers' application, despite counsel's advice, is circumstantial evidence of unconstitutional bias. See Cunningham v. City of Overland, 804 F.2d 1066, 1069 (8th Cir.1986) (board violated due process in denying license, where city attorney had informed board that there were no legal grounds for denial); Busche v. Burkee, 649 F.2d 509, 520 (7th Cir.1981) (police chiefs' disregard of legal counsel's advice established malicious intent), cert. denied 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).
 
 
 50
 Transcripts of the Board hearings also corroborate Tate's observations that Pierce played a prominent role in opposing Stivers' applications. Pierce accused Stivers of lying about his credentials even after the Board's own investigator acknowledged that proof existed as to his hours of service. After the Board voted to deny Stivers' applications, Pierce persisted in opposing another member's suggestion that Russ Jones and Associates be permitted to continue doing business. These actions stand in contrast to the treatment Pierce accorded other prospective licensees; in most cases, he asked few if any question. Taken as a whole, the Board's proceedings provide strong--albeit circumstantial--support for Stivers' contention that Pierce was biased against him.
 
 5. Harassment and Delay
 
 51
 Among the factors we take into account, in determining whether governmental action violated due process, is "whether the action was taken in good faith or for the purpose of causing harm." Sinaloa Lake Owners Ass'n, 882 F.2d at 1409. As the Sixth Circuit observed in Wilkerson, evidence of "harassment and delay in allowing plaintiffs to pursue their occupation" is germane to the question of whether licensing proceedings violated due process. 699 F.2d at 328.
 
 
 52
 Stivers has introduced substantial evidence of harassment and delay by the Board and its agents. In rejecting Stivers' application, the Board relied heavily on a report from its investigator, Robert Rodefer--a report that, by Rodefer's own admission, contains several incomplete, inaccurate, and misleading statements. Rodefer's report raised serious questions about Stivers' claimed experience and character. In his deposition, Rodefer testified that proof of Stivers past employment existed, but that he had failed to find it before completing his report. Additionally, Rodefer testified that there was "no problem" with Stivers' character. After admitting that the report could be viewed as containing "many inaccuracies," Rodefer stated that it was "not one of my greatest investigations." Rodefer's admissions provide strong support for Stivers' contention that the Board intended to prevent him from going into business.
 
 
 53
 The plaintiffs have also produced evidence that the Board's investigators attempted to interfere with the operations of Russ Jones and Associates during the course of the licensing proceedings. According to one customer of Russ Jones and Associates, Lynne Keller of the Gold Dust West Casino, Rodefer falsely informed her that Russ Jones and Associates was doing business illegally. As a result of her conversation with Rodefer, the Gold Dust West cancelled the services of Russ Jones and Associates. Another investigator for the Board, Bill Bertram, approached Russ Jones and Associates' insurer. Bertram stated that the company was doing unlicensed work, prompting the insurance company to cancel its policy. The Board's executive secretary Widmer-Hanna then informed the plaintiffs that the license of Russ Jones and Associates would be revoked if they did not obtain insurance.
 
 
 54
 Such evidence of harassment and delay is directly relevant to the question whether the Board's proceedings were affected by the impermissible bias of one of its members. Wilkerson, 699 F.2d at 328. Along with the evidence of Pierce's pecuniary interest, his hostile statements regarding Stivers, and the evidence of disparate treatment by the Board, the evidence of harassment and delay creates a triable issue of fact as to whether Stivers was denied a fair hearing before an impartial tribunal.
 
 C. Impact of One Member's Bias
 
 55
 In support of their argument that the grant of summary judgment should be upheld, the defendants argue that the evidence at most demonstrates bias on the part of one member of the Board, not the denial of a fair hearing before an impartial tribunal. As the defendants point out, the plaintiffs have produced no evidence that other members of the Board had a pecuniary interest in ensuring that Stivers' application was denied. Because the five-person Board unanimously rejected Stivers' application, the defendants argue that Pierce's participation was irrelevant to the outcome.
 
 
 56
 Neither this court nor the Supreme Court has addressed whether bias on the part of one member of a multi-person tribunal violates due process, without any showing that that member's bias affected the tribunal's decision. In Aetna Life, the Supreme Court expressly declined to address this question. 475 U.S. at 827 n. 4, 106 S.Ct. at 1588 n. 4. The Court first held that one justice of the Alabama Supreme Court was disqualified, by virtue of his pecuniary interest in the outcome of the case before him, but that there was no constitutional bar to the participation of the other eight justices. Id. at 825, 827, 106 S.Ct. at 1587, 1588. Because the disqualified justice's vote was decisive, and because he wrote the majority opinion, there was no question that the Alabama Supreme Court's decision could not be permitted to stand. Id. at 828, 106 S.Ct. at 1588-89. However, the majority expressed no view as to whether the same result would have been required if the biased justice's vote had not been decisive. Id. at 827 n. 4, 106 S.Ct. at 1588 n. 4 (citing Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).
 
 
 57
 While concurring in the majority's opinion, Justice Brennan stated his view that the participation of one biased member would require that the tribunal's decision be vacated regardless of whether that member's vote was decisive. Referring to the collective process of deliberation, Justice Brennan observed that:
 
 
 58
 [W]hile the influence of a single participant in this process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition. The participation of a judge who has a substantial interest in the outcome of a case of which he knows at the time he participates necessarily imports a bias into the deliberative process. This deprives litigants of the impartiality that is the fundamental requirement of due process.
 
 Id. at 831, 106 S.Ct. at 1590.[6]
 
 59
 Other courts have reached the same conclusion as Justice Brennan. In Cinderella Career and Finishing Schools v. Federal Trade Comm'n, the District of Columbia Circuit expressed its view that there is no way of determining the extent to which one biased member's views affect the deliberations of a supposedly impartial tribunal. 425 F.2d 583, 592 (D.C.Cir.1970) (citing Berkshire Employees Ass'n of Berkshire Knitting Mills v. NLRB, 121 F.2d 235, 239 (3d Cir.1941)). Accordingly, that court vacated the decision of an administrative tribunal, even though the biased member's vote was not necessary for a majority. In Hicks v. City of Watonga, 942 F.2d 737, 748 (10th Cir.1991), the Tenth Circuit likewise concluded that the plaintiff could make out a due process claim by showing bias on the part of only one member of the tribunal. Relying on Cinderella Career and Finishing Schools, the Tenth Circuit concluded that the presence of one biased member on a six-person tribunal would "taint[ ] the tribunal" and thereby violate due process, regardless of whether that member cast the deciding vote. Finally, in Wilkerson v. Johnson, 699 F.2d 325, 328-29 (6th Cir.1983), the Sixth Circuit held that barbershop license applicants were denied due process, although only one member of the four-person board had a competitive interest in denying the plaintiffs' license application.
 
 
 60
 We find the reasoning of these courts, and of Justice Brennan in Aetna Life, to be persuasive. Particularly on a small board like the Board before us, a single person's bias is likely to have a profound impact on the decisionmaking process. Cf. Lam v. University of Hawaii, 40 F.3d 1551, 1560 (9th Cir.1994) (evidence of racial and gender bias on the part of one member of fifteen-person faculty precludes summary judgment in Title VII case). As Justice Brennan observed in Aetna Life, it is difficult if not impossible to measure the impact that one member's views have on the process of collective deliberation. Each member contributes not only his vote but also his voice to the deliberative process. Thus, the fact that the tribunal's vote was unanimous does not mean that the bias of one member had no effect on the result.[7]
 
 
 61
 We therefore hold that where one member of a tribunal is actually biased, or where circumstances create the appearance that one member is biased, the proceedings violate due process. The plaintiff need not demonstrate that the biased member's vote was decisive or that his views influenced those of other members. Whether actual or apparent, bias on the part of a single member of a tribunal taints the proceedings and violates due process.
 
 
 62
 Of course, we do not decide whether Pierce was actually biased against Stivers. We hold only that the evidence raises a triable issue of fact as to whether Stivers was deprived of the licenses he sought without due process. Stivers must still convince the trier of fact that Pierce was actually biased against him.[8] However, while the Board's conduct may provide evidence favorable to Stivers' claim, Stivers is not required to show that Pierce's bias affected the Board's ultimate decision to deny his applications.
 
 
 63
 Although Stivers need not show that other members of the Board were influenced by Pierce's bias to make out a due process claim, the impact of Pierce's bias on the other members is germane to the question whether they may be held individually liable. We discuss that question below when we examine the issue of qualified immunity. See infra part III.
 
 D. Waiver of Objection
 
 64
 The defendants further contend that, even if a triable issue exists on the question of bias, Stivers waived any objection by failing to seek Pierce's recusal. See Partington v. Gedan, 880 F.2d 116, 127 (9th Cir.1989) (no denial of impartial tribunal, where state statute permitted plaintiff to seek recusal), vacated, 497 U.S. 1020, 110 S.Ct. 3265, 111 L.Ed.2d 776 (1990), reaff'd, 914 F.2d 1349 (9th Cir.1990), rev'd on other grounds, 923 F.2d 686 (9th Cir.1991) (en banc); Flangas v. State Bar of Nevada, 655 F.2d 946, 950 (9th Cir.1981) (plaintiff's failure to utilize statutorily prescribed disqualification procedures barred court from considering his bias claim). According to the defendants, Stivers was aware of the circumstances creating Pierce's alleged bias at the time of his hearings. The defendants argue that, because Stivers failed to ask that Pierce recuse himself, he waived his right to claim that due process was denied.
 
 
 65
 We conclude that Stivers' failure to object to Pierce's participation in the Board proceedings did not constitute a waiver. Where state law provides a mechanism for seeking recusal, the litigant may be required to avail himself of that mechanism. Partington, 880 F.2d at 127; Flangas, 655 F.2d at 950. The statute governing the Board, however, imposes no such requirement. Nowhere in the statute is there any discussion of recusal or of the circumstances in which recusal is appropriate; nor is any procedure established for the making of recusal requests. Under the circumstances, it is easy to understand why someone in Stivers' position would remain silent. To suggest the existence of a conflict would likely antagonize the Board, and might offer little if any hope for relief. We hold that, where there are no procedures specifically governing recusal, a failure to seek such action does not constitute a waiver.III. ELEVENTH AMENDMENT
 
 
 66
 The defendants contend that, even if the plaintiffs' due process rights were violated, the grant of summary judgment should be upheld on the ground that the Eleventh Amendment bars an action against either the Board or the individual defendants. While it is correct that the Eleventh Amendment shields the Board itself from liability, the individual defendants are not entitled to Eleventh Amendment immunity.
 
 
 67
 The Eleventh Amendment prohibits suits against a state, and section 1983 does not abrogate this immunity. Will v. Michigan Department of State Police, 491 U.S. 58, 62, 109 S.Ct. 2304, 2307-08, 105 L.Ed.2d 45 (1989). In this case, the complaint names the Board as a defendant. As an agency of the state, the Board itself is shielded from liability under the Eleventh Amendment. Mitchell v. Los Angeles Community College Dist., 861 F.2d 198, 201 (9th Cir.1988), cert. denied, 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989). Accordingly, we affirm the grant of summary judgment as to the Board.
 
 
 68
 The Eleventh Amendment also prohibits damage actions against state officials in their official capacities. Id. at 71, 109 S.Ct. at 2312. However, the Eleventh Amendment does not bar suits against state officials for prospective relief. Pennhurst v. Halderman, 465 U.S. 89, 104-06, 104 S.Ct. 900, 910-11, 79 L.Ed.2d 67 (1984). Nor does it bar damage actions against state officials in their personal capacities. Hafer v. Melo, 502 U.S. 21, 31, 112 S.Ct. 358, 365, 116 L.Ed.2d 301 (1991). Personal capacity suits seek to impose liability on state officials for acts taken under color of state law. Id. at 25-26, 112 S.Ct. at 362. In Hafer, the Court made clear that the Eleventh Amendment does not shield state officials from allegations that they violated a federal right while acting under color of state law. Id. at 29, 112 S.Ct. at 364. The Amendment only prohibits damage actions against the "official's office"--actions that are in reality suits against the state itself, rather than its individual officials. Id. at 29, 112 S.Ct. at 364; Will, 491 U.S. at 71, 109 S.Ct. at 2312.
 
 
 69
 Stivers has brought suit against the individual members of the Board, the executive secretary of the Board, and the Board's investigators in their personal capacities. Stivers asserts that, while acting under color of state law, the individual defendants deprived him of a protected property interest without due process. This is not an action against the "officials' office," but an action against the individuals who allegedly deprived Stivers of his right to due process by participating in an unfair decisionmaking process. The fact that the defendants were acting under color of state office does not shield them from personal liability under section 1983. Id. at 31, 112 S.Ct. at 365. Because Stivers' action is against the defendants in their personal capacities for their own wrongdoing, and not in their official capacities, the Eleventh Amendment imposes no bar to his suit.
 
 IV. QUALIFIED IMMUNITY
 
 70
 The defendants further contend that the doctrine of qualified immunity requires that we uphold the district court's grant of summary judgment. We disagree.
 
 
 71
 The qualified immunity doctrine shields government officials from liability, if "a reasonable government official could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988). This standard requires a two-part analysis: (1) whether the law prohibiting the official conduct was clearly established; and (2) whether a reasonable official could have believed that his conduct complied with the law. Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993). If the law prohibiting the conduct was clearly established and a reasonable official could not have believed his conduct lawful, then the official is not immune.
 
 
 72
 Whether the law governing the conduct at issue was clearly established is a question of law for the court to decide. Id. at 873. In this case, Stivers asserts that the defendants denied him his constitutional right to a fair hearing by an unbiased tribunal. Specifically, he asserts that Pierce harbored a bias against him and that this bias influenced the other Board members in their actions. The law is clearly established that the members of a licensing tribunal must be impartial and cannot act on the basis of personal bias. Withrow, 421 U.S. at 46, 95 S.Ct. at 1464; Gibson, 411 U.S. at 578-79, 93 S.Ct. at 1697-98. Thus, the first prong of the qualified immunity test is satisfied.
 
 
 73
 The remaining question is whether officials in the defendants' position could have believed that their conduct was reasonable. This is an objective and fact-specific test. Thorsted, 858 F.2d at 573. In order to answer that question at summary judgment, we must accept the plaintiff's version of the facts. If there is a dispute about facts that are material to the qualified immunity question, summary judgment is inappropriate. Act Up!, 988 F.2d at 872.
 
 
 74
 We have little difficulty in concluding that Pierce is not entitled to assert a qualified immunity defense. If Pierce's opposition to Stivers' application was motivated by his own personal bias, then Pierce would clearly be foreclosed from asserting a qualified immunity defense--a reasonable official harboring actual bias against a license applicant could not have believed that his participation in the licensing proceedings was appropriate. See Hicks v. City of Watonga, 942 F.2d 737 (10th Cir.1991) (rejecting a board member's claim of qualified immunity, where there was evidence tending to show that she was improperly motivated).
 
 
 75
 Whether the other individual defendants have a valid qualified immunity defense presents a somewhat more difficult question. In Hicks, the Tenth Circuit considered the circumstances under which members of a multi-person tribunal are entitled to qualified immunity, where one member is actually biased against the party before it. The court concluded that the plaintiff had introduced evidence of bias on the part of one council member, but had failed to come forward with any evidence of improper motivation or conduct on the part of the other defendants, aside from their votes against the plaintiff. Id. at 748. The court held that the other members had not violated any duty, saying that a contrary ruling would "place on all administrative tribunal members a duty to ferret out possible bias among their colleagues, or to face civil damages regardless of their own fairness and integrity." Id.
 
 
 76
 Although we find the Tenth Circuit's analysis persuasive, we believe the circumstances of this case to be distinguishable. Where the evidence shows actual bias on the part of only one board member, and no improper conduct on the part of the other defendants, those other defendants are not liable. In this case, however, Stivers does not rely simply on the fact that the other Board members voted against him. Rather, he alleges that they all acted in an arbitrary and improper manner. He has introduced evidence that tends to show that the Board's members, executive secretary, and investigators prejudged his applications and acted together to deprive him of the licenses he sought. The hearing transcripts contain evidence that supports his claim that the entire Board, and not just Pierce, accorded the plaintiffs unusually harsh treatment. The transcript shows that, after the plaintiffs were informed that they could do business under the name Russ Jones and Associates, several of the Board's members accused them of operating illegally. Later, the Board rejected its attorney's advice and peremptorily refused to grant Stivers' license applications. Even after Stivers produced documentation of his hours of experience, the Board persisted in its hostility toward the plaintiffs, with one Board member deriding Stivers as a "professional victim" and others accused him of lying. As a witness to the hearings observed, all the Board's members appeared to have "made up their mind" ahead of time and "seemed to be harboring a grudge" toward Stivers. Finally, there is evidence that the Board's employees attempted to interfere with the plaintiffs' business by discouraging their customers.
 
 
 77
 From this evidence, the trier of fact could conclude that all the defendants, influenced by Pierce's bias, prejudged Stivers' application or otherwise acted out of bias. See Wilkerson, 699 F.2d at 328-29 (even though only one member of board had pecuniary interest in denying licensing, evidence supported jury's finding that all board members were biased); cf. Woodrum v. Woodward County, 866 F.2d 1121, 1126 (9th Cir.1989) (plaintiff may show conspiracy under Sec. 1983 by showing agreement to violate constitutional rights). If the defendants joined with Pierce in an effort to deny Stivers' applications, then they would be liable; moreover, in such circumstances, they would not be entitled to qualified immunity. No reasonable official in their position could believe that such conduct was lawful.
 
 
 78
 Following Hicks, we decline to impose upon board members a duty to "ferret out" bias on the part of their colleagues. 942 F.2d at 750. We do, however, hold that they have a duty not to join with the biased member by acting improperly themselves. While the mere fact that decisions adverse to the applicants were rendered is not enough to defeat a qualified immunity defense, evidence of arbitrary and improper treatment by the Board's members and employees may be. Viewed in the light most favorable to the plaintiffs, the evidence supports the conclusion that all the defendants joined in Pierce's efforts to deny Stivers' applications without a fair hearing. Given these factual circumstances, we cannot say as a matter of law that the qualified immunity doctrine shields them from liability.
 
 V. ATTORNEY'S FEES
 
 79
 After the "special board" awarded Stivers his licenses, and again after the grant of summary judgment, the plaintiffs filed a motion for attorney's fees under 42 U.S.C. Sec. 1988. The plaintiffs asserted entitlement to fees because they had obtained some of the relief sought by this action--namely, licenses permitting Stivers to work as a private investigator, private patrolman, and process server. The court rejected the fee application, reasoning that the plaintiffs could not be considered prevailing parties, because they lost their damages claim on the merits.
 
 
 80
 We review factual findings underlying the district court's decision to deny fees for clear error. Sablan v. Dept. of Finance, 856 F.2d 1317, 1324 (9th Cir.1988). However, we will reverse the fee determination if the district court applied an incorrect legal standard in arriving at its decision. Lummi Indian Tribe v. Oltman, 720 F.2d 1124, 1125 (9th Cir.1983). In this case, we conclude that the district court applied the wrong standard in determining whether or not there was a "legal basis" for Stivers' claim. Had the court applied the proper standard, it would have been compelled to award fees.
 
 A. Prevailing Party Status
 
 81
 A plaintiff may only recover fees under section 1988 if he is the "prevailing party." Hewitt v. Helms, 482 U.S. 755, 760, 107 S.Ct. 2672, 2675-76, 96 L.Ed.2d 654 (1987). A litigant need not prevail on every issue, or even on the "central issue" in the case, to be considered the prevailing party. Texas State Teachers Ass'n v. Garland Independent School Dist., 489 U.S. 782, 790, 109 S.Ct. 1486, 1492-93, 103 L.Ed.2d 866 (1989). It is enough that he succeed "on any significant claim affording some of the relief sought, either pendente lite or at the conclusion of the litigation." Id. at 791, 109 S.Ct. at 1493.
 
 
 82
 If the plaintiff is only partially successful in seeking the relief, and achieves only some of the benefit sought by the litigation, he is still considered the prevailing party. Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). The degree of success is irrelevant to the question whether the plaintiff is the prevailing party. Id. at 112-14, 113 S.Ct. at 574. The relief afforded the plaintiff need not be "judicially decreed" to justify a fee award under section 1988--voluntary action, such as a change in conduct that addresses the grievance, is sufficient. Farrar, 506 U.S. at 111-12, 113 S.Ct. at 573; Hewitt, 482 U.S. at 760-61, 107 S.Ct. at 2675-76. The focus is on the substance of the relief granted. Sablan, 856 F.2d at 1324.
 
 
 83
 The plaintiffs point out that, after this action was commenced, the defendants agreed to convene a "special board" meeting. At this meeting, the Board awarded Stivers some of the relief sought--specifically, his individual licenses to work as a private investigator, private patrolman, and process server. The plaintiffs subsequently dropped their claim for injunctive relief. They contend that their federal suit was the "catalyst" for the decision to convene the special board that granted the licenses and, consequently, that they qualify as prevailing parties.
 
 
 84
 Where the plaintiff asserts that his lawsuit was the "catalyst" for the relief awarded, the court must determine: (1) whether there is a "causal link" between the lawsuit and the relief awarded; and (2) whether there was a "legal basis" for the plaintiffs claim. Sablan, 856 F.2d at 1325. There can be no doubt that both criteria are satisfied here.
 
 1. Causal Link
 
 85
 The "causal link" prong of the catalyst test is an inquiry into factual causation. Id. In this case, the district court determined that there was a causal link between this suit and the relief obtained. We agree.
 
 
 86
 The Board responded to the plaintiffs' lawsuit by convening "a special board" which reconsidered the denial of Stivers' application for "lack of integrity" and awarded him his licenses. Although the defendants now argue that the Board's reconsideration of the license application was "gratuitous," the evidence of record undermines their contention. In fact, during the district court proceedings, the defendants conceded that the special board meeting was convened in order to partially settle this suit. In her deposition, Board member Conrad admitted that the convening of the special board was "part and parcel of settlement negotiations." Furthermore, the defendants' brief in support of their motion for a protective order strenuously argued that the special board meeting was a "settlement overture" aimed at resolving the injunctive relief portion of the plaintiff's suit.
 
 
 87
 On appeal, the defendants have reversed their position; they now contend that the special board meeting was "gratuitous." We reject this abrupt and calculated change of position. As the district court recognized, the plaintiffs' federal action bore a direct causal connection to the relief obtained.
 
 2. Legal Basis
 
 88
 The second prong of the "catalyst" test requires us to determine whether there was a "legal basis" for the plaintiffs' claims. We conclude that the district court committed an error of law in answering this question.
 
 
 89
 The district court reasoned that, because the plaintiffs lost on the merits of their damages claim, the "legal basis" prong was not satisfied. That is not, however, the law in this circuit. A plaintiff who obtains a favorable settlement is not required to demonstrate that he would have prevailed on the merits in order to be considered a prevailing party. For the purposes of determining entitlement to fees, a claim has a basis in law so long as it is not "frivolous, unreasonable, or groundless." Sablan, 856 F.2d at 1327 (quoting Fitzharris v. Wolff, 702 F.2d 836, 836 (9th Cir.1983)).[9] Thus, even if the district court had been correct in granting summary judgment to the defendants on the merits, the plaintiffs would not necessarily have been foreclosed from obtaining attorney's fees for time spent pursuing injunctive relief.
 
 
 90
 Here, the plaintiffs have raised substantial legal and factual questions. Their claims are by no means frivolous, unreasonable, or groundless. Accordingly, there is no doubt that the plaintiffs have satisfied the "legal basis" prong.
 
 
 91
 Because the action brought by plaintiffs was the catalyst for a settlement that obtained some of the injunctive relief they sought, and because the plaintiffs' claims have a basis in law, they qualify as prevailing parties.
 
 B. Impact of Farrar v. Hobby
 
 92
 Relying on the Supreme Court's recent decision in Farrar v. Hobby, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the defendants contend that, even if the action was the catalyst for the relief provided, the plaintiffs are not entitled to any fees. We reject the defendants' contention that Farrar provides a basis for upholding the denial of fees in this case.
 
 
 93
 Farrar does not alter the test for determining when a litigant qualifies as a prevailing party. The Court explicitly affirmed its prior holding that the degree of success does not affect the prevailing party inquiry. Id. at 112-14, 113 S.Ct. at 574.[10] Farrar does, however, change the standard for determining when a prevailing party is entitled to recover fees. Farrar holds that a prevailing party may be denied fees where he obtains only a narrow, technical victory such as nominal damages. Id. at 114-16, 113 S.Ct. at 575. In such cases, "the only reasonable fee is usually no fee at all." Id.; see also Romberg v. Nichols, 48 F.3d 453, 455 (9th Cir.1995) (district court did not err in denying fees to prevailing party who originally sought $2 million in damages but obtained only $1).
 
 
 94
 Farrar's holding is limited to cases in which the plaintiff seeks substantial monetary damages but obtains only a nominal award. This case is clearly not among those to which the Farrar rule applies. As the defendants point out, the plaintiffs did not obtain all the injunctive relief originally sought. The special board did not grant Chamar a license. Nor, of course, did it grant Ernsberger and Stivers licenses as corporate officers or qualifying agents of Chamar. It did, however, grant Stivers individual licenses, permitting him to work as a private patrolman, process server, and investigator. The settlement obtained was more than a de minimis victory. While the plaintiffs did not obtain all the relief sought, they did obtain "tangible results," Wilcox v. City of Reno, 42 F.3d 550, 555 (9th Cir.1994), and are therefore entitled to fees.[11] We remand for the district court to determine the appropriate amount of fees.[12]
 
 VI. CONCLUSION
 
 95
 Stivers has raised a triable issue of fact as to whether his due process rights were violated. He has produced evidence from which the trier of fact could infer that Pierce's bias affected the Board's deliberations and the actions of its members, thus violating Stivers' right to a fair hearing before an impartial tribunal. While the Eleventh Amendment shields the Board itself from liability, neither the Eleventh Amendment nor the qualified immunity doctrine prevents Stivers from proceeding against the individual defendants in their personal capacities. We thus affirm the grant of summary judgment as to the Board itself, but reverse the grant of summary judgment with respect to Stivers' claims for damages and declaratory relief against the individual defendants and remand these claims for trial.
 
 
 96
 We also conclude that the district court erred in denying the plaintiffs attorney's fees with respect to their claims for injunctive relief. This action was the catalyst for the special board meeting through which the plaintiffs obtained significant relief. Whether or not the plaintiffs ultimately prevail on the merits, there can be no question that the plaintiffs' claims for injunctive relief had a legal basis. Thus, the plaintiffs are entitled to recover fees for time spent pursuing injunctive relief. We remand for determination of the appropriate amount of fees.
 
 
 97
 AFFIRMED in part; REVERSED in part and REMANDED.
 
 NOONAN, Circuit Judge, concurring:
 
 98
 I concur in the opinion and judgment of the court except that I do not believe it appropriate in Part II B1 for the court to speculate as to the existence of a genuine issue as to the appearance of bias and as to the facts Stivers might conceivably prove; I do not believe that Stivers has shown that Rodefer's report was the result of any decision by the Board to harass him; in Part IV A2 n. 9, the court has mistakenly expanded Sablan, 856 F.2d at 1327 by prefacing the quote from Sablan with the words "if prior to the assertion of the plaintiff's claim;" and under Farrar v. Hobby, 506 U.S. 103, ----, 113 S.Ct. 566, 575, 121 L.Ed.2d 494 (1992) the plaintiffs in the plural are not entitled to any counsel fees because only Stivers achieved success.
 
 
 
 [1]
 Because this is a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Accordingly, we assume for purposes of this opinion that the facts presented by the plaintiffs are true. In any event, those are the facts on which we base this opinion
 
 
 [2]
 As discussed infra part II.B.5, Rodefer admitted in his deposition that this report contained several serious inaccuracies and omissions
 
 
 [3]
 Before the district court granted their motion for summary judgment, the defendants moved for a protective order prohibiting any mention of the special board, on the grounds that: (1) it was irrelevant; (2) it was inadmissible as a subsequent remedial measure; and (3) it was an offer of settlement. The district court granted the defendants' motion for a protective order, without stating its reasons for doing so. Under the terms of this order, the "special board" was to be referred to at trial only for the purpose of limiting damages by showing the date on which Stivers was issued a license. Because Stivers does not challenge this protective order, we do not consider the "special board" meeting in reviewing the district court's decision to grant summary judgment. This meeting is relevant only to the question of the plaintiffs' entitlement to attorney's fees
 
 
 [4]
 The defendants' brief contains a single parenthetical statement disagreeing with the district court's holding on this issue: "The [district] Court did find the plaintiffs had a property interest in being licensed by the [Board] (a conclusion with which the defendants-appellees disagree on the basis of Kraft v. Jacka, 872 F.2d 862, 866 (9th Cir.1989))...." As the district court recognized, and as Kraft states, the existence of a protected property interest hinges on whether state law confers a "reasonable expectation of entitlement." Id. at 866. In Kraft, the court determined that the Nevada Gaming Board had almost absolute discretion to grant or deny new gaming licenses. Id. at 868; see also Jacobson v. Hannifin, 627 F.2d 177, 180 (9th Cir.1980) (finding no protected property interest, where gaming statute gave board "full and absolute power and authority" to grant or deny gaming licenses). In contrast, the Private Investigator Licensing Board's actions are limited by significant substantive restrictions. See Nev.Rev.Stat. Secs. 648.005 et. seq. The district court properly concluded that these restrictions create a protected property interest in the licenses in question
 
 
 [5]
 After the special board meeting, at which Stivers was awarded his individual license, the plaintiffs informed the court that there was "no further issue of injunctive relief." Thus, no claim for injunctive relief is before us on appeal
 In their appellate briefs, the plaintiffs do not challenge the district court's determination that the statute of limitations had expired with respect to Chamar's claim or its determination that Ernsberger could not sue on behalf of Chamar. They raise only the issue whether Stivers was denied a fair hearing before a fair tribunal when he applied for licenses as a private investigator, private patrolman, and process server. Although the plaintiffs at oral argument asserted that the grant of summary judgment was also erroneous as to Ernsberger's and Chamar's claims, they waived this issue by failing to raise it in their briefs. See In re Riverside-Linden Investment Co., 945 F.2d 320, 324-25 (9th Cir.1991). Accordingly, our inquiry is limited to the question whether the district court erred in granting summary judgment to the defendants on Stivers' claim for damages and declaratory relief. (It is not clear what if any declaratory relief may be available to Stivers but because the parties do not address that question, neither do we.)
 
 
 [6]
 Justices Blackmun, who concurred only in the judgment, expressed a view similar to that of Justice Brennan. See id. at 831-33, 106 S.Ct. at 1590-91 (Blackmun, J., concurring). Blackmun's opinion, in which Justice Marshall joined, states that the participation of one biased justice "posed an unacceptable danger of subtly distorting the decisionmaking process." Id. at 831, 106 S.Ct. at 1590. Therefore, the fact that the biased justice cast the deciding vote was, in Justice Blackmun's view, "irrelevant" to the question whether the proceedings violated due process. Id
 
 
 [7]
 The defendants cite Arroyo Vista Partners v. County of Santa Barbara, 732 F.Supp. 1046 (C.D.Cal.1990) and Flickinger v. School Bd. of City of Norfolk, 799 F.Supp. 586 (E.D.Va.1992) in support of their argument that the evidence of Pierce's bias is insufficient to require reversal. Neither of these cases supports their position. The question in both Arroyo Vista and Flickinger was whether the evidence was sufficient to hold municipal entities liable under Monell v. Department of Social Svs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To hold municipal entities liable under Monell, the plaintiffs must demonstrate that the unlawful governmental action was part of the municipality's policy or custom. St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). In this case, however, the issue is not the liability of a municipal entity, but the liability of the individual members and employees of the Board. Monell's requirement that plaintiffs establish the existence of a policy or custom is thus inapplicable here
 
 
 [8]
 As discussed supra part II.B.1, Stivers may also attempt to develop the record further to show that Pierce's financial interest is such as to create an appearance of bias that would require his recusal
 
 
 [9]
 The defendants' brief, relying on Nadeau v. Helgemoe, 581 F.2d 275, 281 (1st Cir.1978), contends that a plaintiff may not be considered the prevailing party unless the relief obtained was required by law. Defendants misstate Nadeau. As Sablan makes clear, this is not the correct legal test in this circuit. Nor is it the test in the First Circuit. The rule there, as here, is that even if the plaintiff would ultimately have been unsuccessful in obtaining the relief sought, he is entitled to attorney's fees so long as his claim is not frivolous, unreasonable, or groundless. On the other hand, a defendant is deemed to act gratuitously if prior to the assertion of the plaintiff's claim there has been a "judicial determination that defendant's conduct ... is not required by law." Sablan, 856 F.2d at 1327 (quoting California Ass'n of the Physically Handicapped, Inc. v. FCC, 721 F.2d 667, 671-72 (9th Cir.1983), cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 63 (1984), quoting Nadeau, 581 F.2d at 281)
 
 
 [10]
 Farrar also reaffirms the Court's prior holding that a plaintiff need not obtain a judicial decree to be considered the prevailing party. To qualify as a prevailing party, "[t]he plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." Id. at 111-12, 113 S.Ct. at 573 (citations omitted, emphasis added). A settlement that effects a material alteration in the legal relationship between plaintiff and defendant is sufficient to confer prevailing party status. Id. at 111-12, 113 S.Ct. at 573 (citing Texas State Teacher's Ass'n, 489 U.S. 782, 792-93, 109 S.Ct. 1486, 1493-94, 103 L.Ed.2d 866 (1989))
 
 
 [11]
 In fact, the tangible results in this case were substantial. For Stivers, they meant the difference between being able to work at his profession and having to find a new and different way of trying to earn a living--certainly not an easy task these days
 
 
 [12]
 Although Ernsberger and Chamar did not receive the licenses they sought, this action did result in Stivers' receiving licenses. Because Stivers' licenses were a necessary component of the relief the plaintiffs were collectively seeking, they may be entitled to fees. However, we leave it to the district court to determine the amount that is reasonable