Toure BUTLER, Plaintiff,

v.

The NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,
Defendant.

No. C96–1656L.

United States District Court,
W.D. Washington,
at Seattle.

Sept. 15, 1999.

Order Clarifying Opinion on
Denial of Reconsideration,
Nov. 8, 1999.

Michael D. Hunsinger, Ronald G. Neubauer, Neubauer & Hunsinger, Seattle, WA, for Toure Butler, plaintiff.

Peter D. Byrnes, Paul R. Taylor, Byrnes & Keller, Seattle, WA, for National Collegiate Athletic Association, an unincorporated association, defendant.

Daniel W. Sutherland, U.S. Department of Justice, Civil Rights Division, Disability Rights, Washington, DC, for United States of America, amicus.

### ORDER DENYING MOTION FOR ATTORNEYS' FEES AND COSTS

LASNIK, District Judge.

■ Plaintiff's counsel, Neubauer & Hunsinger, have requested $196,703.63 in

attorneys' fees and costs related to the above-captioned matter. Plaintiff's discrimination claims were brought under the Americans with Disabilities Act ("ADA") and counsel seeks fees under that statute.[1]

### PREVAILING PARTY ANALYSIS

■ In order to recover fees under the ADA, plaintiff must have prevailed on his statutory claims. To qualify as a prevailing party, plaintiff must obtain at least some relief on the merits of his claim. "The relief afforded the plaintiff need not be judicially decreed to justify a fee award ...—voluntary action, such as a change in conduct that addresses the grievance, is sufficient." *Stivers v. Pierce,* 71 F.3d 732, 751 (9th Cir.1995) (quotations omitted). The judgment, consent decree, or settlement must affect the behavior of the defendant toward the plaintiff, conferring a benefit on plaintiff. "Only under these circumstances can civil rights litigation effect 'the material alteration of the legal relationship of the parties' and thereby transform the plaintiff into a prevailing party." *Farrar v. Hobby,* 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (citations omitted).

Where plaintiff claims relief through defendant's voluntary action, the Court must assure itself that plaintiff's lawsuit prompted or is causally connected to the relief obtained. Plaintiff must, therefore, show that he has both obtained a benefit sought in the litigation and caused defendant to convey that benefit.[2]

---

1. Pursuant to 42 U.S.C. § 12205, the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs...." The NCAA argues that no fees may be granted under 42 U.S.C. § 12205 because there has been no judicial finding that the ADA applies to plaintiff's claim. Such an argument adds a hurdle where none exists. If a plaintiff satisfies the "prevailing party" requirement, the Court need not go back and determine whether or not plaintiff's ADA claims had actual legal merit. *See, e.g., Hewitt v. Helms,* 482 U.S. 755, 760–61, 107 S.Ct. 2672, 96 L.Ed.2d

654 (1987). Where a plaintiff's litigation forces the defendant to change its position to the benefit of the plaintiff, plaintiff has prevailed. In such circumstances, as long as the claim was not frivolous, the Court need not determine its validity. *See, e.g., Sablan v. Dept. of Finance of the N. Mariana Islands,* 856 F.2d 1317, 1325 (9th Cir.1988).

2. The factual findings necessary to determine whether plaintiff is a "prevailing party" for purposes of collecting attorneys' fees are within the discretion of the district court. *See, e.g., Goehring v. Brophy,* 94 F.3d 1294,

## A. BENEFIT OBTAINED

█ Plaintiff brought suit under the ADA in an attempt to prevent the NCAA from declaring him nonqualified to compete as a member of the UW football team. Such a declaration would have precluded him from receiving an athletic scholarship from UW during his freshman year. Complaint for Injunctive Relief at 12. Plaintiff was granted temporary relief through this Court's Order Issuing Preliminary Injunction (dated 11/8/96) and was able to participate in the UW football program during his freshman and sophomore years under the protection of that injunction.[3] On May 26, 1998, the NCAA entered into a Consent Decree with the United States Department of Justice which obligated the NCAA to reevaluate its eligibility requirements regarding learning disabled student-athletes. In particular, the NCAA was to propose changes to its bylaws that would, in the future, allow certain courses designed for students with learning disabilities to be counted towards the student's core-curriculum requirements when determining whether the student was qualified to participate in college sports and/or to receive athletic scholarships.[4]

█ For learning disabled students who had already matriculated under the old standards, the NCAA agreed to propose bylaw changes that would allow such students the opportunity to receive a fourth year of athletic eligibility and a fifth year of athletic scholarships. The NCAA argues that because this provision would not provide any benefit to plaintiff until one or two years after the Consent Decree was signed, it cannot qualify him as a prevailing party under the ADA. It is undisputed, however, that, prior to the entry of the Consent Decree, plaintiff was at risk of being denied the opportunity to play a fourth year and to receive a UW scholarship for his fifth year of academics. Had plaintiff ultimately lost this litigation, the NCAA could have stripped him of his qualifier status under NCAA Bylaw 14.02.9, relegating him to nonqualifier status. Nonqualifiers are limited to three years of athletic participation and four years of athletic scholarship (NCAA Bylaws 14.3.2.2 and 14.3.3), as opposed to the four years of athletic participation and five years of athletic scholarship that are available to qualifiers (NCAA Bylaw 14.2.1, Figure 14–3).[5] Under these circumstances, the Court finds that, at the time the NCAA voluntarily agreed to revise its evaluation and

---

1304–05 (9th Cir.1996) (*overruled on other grounds, City of Boerne v. P.F. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)), *cert. denied,* 520 U.S. 1156, 117 S.Ct. 1335, 137 L.Ed.2d 495 (1997).

3. The preliminary injunction entered in this case was not issued on the merits, but rather on the great risk of irreparable harm then facing plaintiff. The injunction cannot, therefore, be the basis for a finding that plaintiff prevailed on the merits of his lawsuit. *See, e.g., Farrar,* 506 U.S. at 111, 113 S.Ct. 566.

4. The NCAA argues that because the Consent Decree was merely a promise to have its legislative body consider certain changes to the bylaws, there was no immediate change in the relationship between the parties. The parties to the Consent Decree fully expected that the legislative body would enact the proposed changes during plaintiff's college career, however. Not only did the NCAA tout the agreement as a fait accompli, but the Consent Decree provides specific deadlines for enactment and reserves the United States' right to pursue its litigation against the NCAA

should the NCAA fail to implement the changes. The NCAA's promise to take steps to fix a perceived problem are, in these circumstances, a benefit to plaintiff. (The changes set forth in Attachment A to the Consent Decree were adopted by the NCAA on or about January 12, 1999.)

5. The NCAA further argues that because plaintiff's right to extend both his athletic and academic careers is contingent on plaintiff's meeting certain academic requirements, plaintiff receives no enforceable benefit from the Consent Decree. The Court notes, however, that other classes of athletes, such as the partial qualifiers, are given opportunities to compete that are contingent on their attaining certain academic benchmarks. *See* NCAA Bylaw 14.3.3.1. The fact that one party must perform his part of the contract before the other need perform does not destroy the value of the opportunity guaranteed by the contract. Thus, simply knowing that if he completes 75% of his degree program and is recognized as learning disabled he will be entitled to a fourth year of athletic eligibility is an opportunity that would otherwise have been denied plaintiff had he lost this litigation.

categorization of special needs students, plaintiff obtained a benefit, namely an opportunity that he otherwise would not have had.

## B. CATALYST ANALYSIS

■ Plaintiff's entitlement to attorneys' fees under the ADA is complicated by the fact that plaintiff himself reached no settlement or agreement with defendants. Plaintiff's opportunity to play college football for four years and to receive scholarships for five years grew out of a Consent Decree between defendant and a third party, the United States Department of Justice ("DOJ"). In such circumstances, plaintiff must show that his lawsuit was a "catalyst" for entry of the Consent Decree, *i.e.*, that there is "some sort of clear, causal relationship between the litigation brought and the practical outcome realized." *American Constitutional Party v. Munro*, 650 F.2d 184, 188 (9th Cir.1981) (emphasis omitted).

■ The catalyst analysis involves a two-pronged test. First, the Court must determine whether plaintiff's lawsuit, and the relief he sought in it, was causally linked to the changes made by defendant. *Sablan v. Dept. of Finance of the N. Mariana Islands*, 856 F.2d 1317, 1325 (9th Cir. 1988). Second, there must be a legal basis for the plaintiff's claim. *Id.*

### 1. Causal Connection

With respect to the first prong of the test, the Court must determine what plaintiff sought to accomplish in bringing his lawsuit and then determine whether the lawsuit was causally related to the relief actually obtained. *Sablan*, 856 F.2d at 1325. " '[A]s long as the relief obtained is of the same general type' as that demanded by [plaintiff, the Court] then assess[es] whether there was a 'causal connection' between the relief obtained and the lawsuit." *Id.* It is clear on the record that by the close of his lawsuit, plaintiff had achieved virtually all of his objectives: he

retained his athletic scholarship through his first two years of college, played for the UW football team, and now has the opportunity of playing as long, and with the same financial backing, as individuals who the NCAA initially deemed "qualified." Thus, plaintiff accomplished that which he hoped to attain through his lawsuit.

■ Whether plaintiff's suit was causally connected to the relief obtained is hotly contested by the parties, however. Elsa Kircher Cole, one of the NCAA's attorneys who negotiated the Consent Decree, avers that, because the NCAA believed it had a very strong defense to plaintiff's claims, his "case had utterly no impact on the NCAA's decision to enter into the consent decree." Decl. of Cole at ¶ 9. Ms. Cole further states that plaintiff's claim was discussed during the NCAA–DOJ negotiations only to establish that litigations such as his were not being settled or otherwise compromised by entry of the Consent Decree. Supplemental Decl. of Cole at ¶ 2. Plaintiff's counsel, for their part, have listed their numerous contacts with the DOJ attorneys involved in the negotiations and argued that their input both prompted the government to seek a resolution of this conflict with the NCAA and aided the government in its negotiations. Plaintiff's counsel also argues that the significant events in this litigation, such as the entry of the preliminary injunction and the summary judgment briefing, pushed defendant into the Consent Decree. Finally, the attorney of record in the United States' suit against the NCAA, Daniel W. Sutherland, avers that plaintiff's litigation was, in one way or another, an "important element" in DOJ's investigation of the NCAA and the content of DOJ's discussions with the NCAA. Decl. of Sutherland at ¶¶ 5–8.

The Court must determine whether plaintiff has met his burden of showing a clear causal link between his litigation and the entry of the Consent Decree between DOJ and the NCAA.[6] Having reviewed all

---

6. The circumstances of this case raise a very interesting, and apparently novel, legal question regarding the directness with which plaintiff's lawsuit must influence defendant's

of the relevant evidence presented by the parties, the Court concludes that plaintiff's litigation did not cause the government to investigate, sue, or settle with the NCAA. At least seven months before plaintiff filed his lawsuit, DOJ was meeting with NCAA staff in an attempt to evaluate "NCAA initial eligibility policies as they relate to student-athletes with learning disabilities." Decl. of Cole, Exhibit 1. By the time this litigation was initiated, DOJ and the NCAA were already discussing specific remedial options. Decl. of Cole, Exhibit 3. When DOJ finally alerted the NCAA that it believed there had been a violation of the ADA, plaintiff's suit had been pending for almost one year and the notice letter, which specifically mentions the plight of certain learning disabled student-athletes, attributes the initiation of an investigation to DOJ's receipt of "several complaints," and notes that DOJ had reviewed "the files of, and/or other documents from, over one hundred students with learning disabilities who have experienced difficulties with the NCAA's initial-eligibility requirements," does not mention plaintiff at all. Decl. of Cole, Exhibit 13. At best, one could assume from the letter that plaintiff was one of the hundred or so cases considered by the DOJ during the investigation.

The Court does not believe that the chronology of events surrounding DOJ's investigation and negotiations with the NCAA favors plaintiff, nor does the fact that the NCAA was aware of plaintiff's suit carry much weight. First, DOJ's investigation not only predated plaintiff's litigation, but it also predated the events which gave rise to plaintiff's cause of action. Plaintiff was not deemed nonqualified until several months after the plight of other student-athletes had pushed DOJ into investigating defendant's practices.

Second, DOJ waited until almost a year after plaintiff filed this litigation and obtained a preliminary injunction to notify the NCAA that it intended to bring suit, undermining any inference that the preliminary injunction prompted DOJ's action. Finally, while it is undisputed that plaintiff's counsel conferred with the DOJ attorneys a number of times during the course of this litigation, there is almost no evidence regarding the substance of the letters or telephone conversations. The record as it stands leaves the Court to guess whether the communications were substantial or consisted merely of transmittal letters and/or inquiries regarding the status of the DOJ/NCAA negotiations.

Plaintiff relies on the declarations of Michael D. Hunsinger, plaintiff's counsel, and Daniel W. Sutherland, the DOJ attorney of record, to show that his litigation somehow prompted DOJ and the NCAA to enter into the Consent Decree. Mr. Hunsinger states that "on July 29, 1997, Mr. Sutherland spent over an hour on the telephone with ... me, requesting and receiving our advice regarding changes in NCAA initial eligibility procedures for learning disabled student-athletes that the Justice Department should demand, some of which were ultimately included in the Consent Decree." Decl. of Hunsinger at ¶ 45. Mr. Sutherland, for his part, acknowledges that plaintiff's counsel provided information that was "an important element in the Department of Justice's decision-making related to the investigation of the NCAA" and that Mr. Hunsinger's "views were incorporated into the Department's discussions during the course of negotiating the terms of the Consent Decree." Decl. of Sutherland at ¶¶ 6 and 8. Once again, however, the Court is left to guess whether DOJ was already contemplating the reme-

---

behavior in order to justify a finding of causal connection. Plaintiff's counsel have taken the position that impacting the DOJ's conduct, which in turn impacted defendant's conduct, justifies the award of fees. Defendant, however, argues that liability for attorneys' fees attaches only where plaintiff's litigation had some direct effect on defendant, such that it prompted defendant to alter its position in a

way that benefitted plaintiff. Without deciding the issue, the Court assumes for purposes of this motion that the causation element of the catalyst analysis is satisfied where plaintiff's litigation in some way causes defendant to change its conduct or regulations to the benefit of plaintiff, even if plaintiff's case exerts its influence indirectly through a third party such as DOJ.

dies suggested by Mr. Hunsinger during the July 29th conversation, how the information provided by Mr. Hunsinger impacted the investigation, and whether Mr. Hunsinger's views impacted the Consent Decree itself. In light of DOJ's apparent unwillingness or inability to aver that plaintiff's litigation in some way "caused" the Consent Decree, its reliance on numerous other complaints, litigations, and student files in initiating its investigation and settlement negotiations, and the lack of specificity in the evidence regarding the substance and import of plaintiff's communications with the DOJ, the Court finds the declarations of Mr. Hunsinger and Mr. Sutherland unpersuasive.

Finally, the NCAA has produced a chronological explanation of its activities that supports its argument that the timing and events associated with plaintiff's litigation had nothing to do with the timing of the negotiations and entry of the Consent Decree. Decl. of Cole at ¶ 6. Mr. Sutherland has verified the accuracy of this chronology. Decl. of Sutherland at ¶ 4. The NCAA has also given a plausible and convincing explanation of its willingness to negotiate and settle with the DOJ that has no connection to plaintiff's litigation. The NCAA maintained, and continues to maintain, that it is not subject to the ADA and therefore has a strong defense to actions such as plaintiff's. The fact that the NCAA settled with DOJ, it is argued, has more to do with a desire to do right vis-a-vis learning disabled student-athletes (not to mention a desire to avoid a protracted litigation with the United States government) than with an admission that the ADA applies and/or was violated by the NCAA's eligibility standards. The Court finds the NCAA's explanations plausible, giving rise to substantial doubts regarding plaintiff's claim that his litigation had an impact on the terms or timing of the Consent Decree to which the NCAA agreed.

For all of the above reasons, the Court is unable to determine that plaintiff's litigation is causally related to the relief he obtained through entry of the Consent Decree. It is just as likely, if not more so, that plaintiff's litigation, while critical to his own circumstances and well-being, was merely one of many factors in both the DOJ's and the NCAA's settlement calculations. The evidence strongly suggests that the Consent Decree would have been entered even if plaintiff had not instituted his litigation and that this suit had no real impact on the initiation or conclusion of DOJ's negotiations with defendant. In such circumstances, plaintiff has not met his burden of proof regarding the causal connection element of the catalyst test.[7]

### 2. Legal Merit

In order to establish that his claim satisfies the second prong of the catalyst analysis, there must be a legal basis for plaintiff's claims. Plaintiff need not show that his claim would have prevailed on the merits, but only that his claim was not "frivolous, unreasonable, or groundless." *Stivers*, 71 F.3d at 752 (citations omitted). Because plaintiff has not shown a causal connection between his litigation and the relief obtained, the Court need not determine whether the claim had a legal basis.

### CONCLUSION

Plaintiff's counsel's motion for attorneys' fees under 42 U.S.C. § 12205 is hereby DENIED.

### ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION AND CLARIFYING PRIOR ORDER

Plaintiff's motion for reconsideration of this Court's Order Denying Motion for

---

7. The Court recognizes the harsh effects of this finding. In the fall of 1996, Mr. Butler had no choice but to initiate litigation. He could not afford the luxury of waiting to see what the outcome of DOJ's investigation would be since he faced the immediate loss of his scholarship. Neubauer & Hunsinger agreed to take on this necessary case, obtained preliminary relief, and "held the fort" until DOJ could deliver a permanent settlement of the issues. Regardless of the various equitable factors that support a grant of fees, under the statutory scheme set forth by Congress and its interpretation by the Supreme Court and the Ninth Circuit, an award is not justified in this case.

Attorneys' Fees and Costs, dated 9/15/99, is DENIED. Plaintiff has not presented any new facts or legal authority that could not have been brought to the Court's attention earlier and has not demonstrated manifest error. The only new evidence produced by plaintiff, namely the correspondence between plaintiff's counsel and the Department of Justice, does not support counsel's claim of co-counsel status or the argument that plaintiff's litigation was causally connected to NCAA's settlement with the government.

A significant portion of plaintiff's motion argues that the Court applied the wrong standard when analyzing causation. The Court takes this opportunity to clarify that, despite language in the previous order that could be read to suggest that the Court required a showing of "but for" causation, the Court in fact applied the standard set forth in *American Constitutional Party v. Munro*, 650 F.2d 184, 187 (9th Cir.1981). On the record presented, it was, and is, impossible to conclude that plaintiff's litigation had a clear, causal relationship with the entry of the Consent Decree, was a material factor in bringing about the Consent Decree, or contributed in some significant way to that settlement. In such circumstances, despite the potential chilling effect such a ruling may have on a plaintiff's ability to obtain qualified counsel where a government agency is in the process of addressing plaintiff's complaints, a finding that plaintiff "prevailed" and is entitled to attorneys' fees would be inappropriate.